IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

|  |  |  |
|---|---|---|
| JACKIE D. GILLIAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:07-CV-149 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION</u>**

This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 14] will be granted, and plaintiff's motion for judgment on the pleadings [doc. 11] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

Plaintiff applied for benefits in June 2004, alleging a disability onset date of June 30, 2003. [Tr. 44]. He is purportedly disabled by residual problems with learning, vision, hearing, motor skills, and short-term memory secondary to a 2001 traumatic brain

injury. [Tr. 191, 209, 237].

The application was denied initially and on reconsideration. Plaintiff then received a hearing before an Administrative Law Judge ("ALJ") in January 2006.

On April 26, 2006, the ALJ issued a decision denying benefits. He found that plaintiff suffers from a seizure disorder, which is a "severe" impairment but unequal to any impairment listed by the Commissioner. [Tr. 17-18]. Of particular relevance to the present appeal, the ALJ concluded that plaintiff does not suffer from any significant mental impairment. [Tr. 19-21]. He concluded that plaintiff retains the residual functional capacity ("RFC") to work at all levels of exertion, "except for work which requires climbing ladders, ropes and scaffolds and work that involves exposure to machinery or heights[.]" [Tr. 22]. Applying Grid Rule 204.00, the ALJ concluded that plaintiff is not disabled and thus ineligible for benefits. [Tr. 22].

Plaintiff then sought review from the Commissioner's Appeals Council. Review was denied on May 31, 2007. [Tr. 4]. The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. § 404.981. Through his timely complaint, plaintiff has properly brought his case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Background*

Plaintiff was born in 1951 and has a twelfth grade education. [Tr. 44, 681]. His past relevant work is as a firefighter. [Tr. 201]. After his 2001 fall, plaintiff returned

to work in late 2001 until his June 30, 2003 retirement. [Tr. 682]. During this time, he allegedly exhibited a significant amount of confusion which rendered him unable to effectively do his job. [Tr. 682-84].

On September 3, 2004, plaintiff told the Commissioner that he cannot perform most household chores independently due to his fear of falling. [Tr. 240]. However, two weeks later he told a consulting source that he lives alone and does all his own household chores other than lawnmowing. [Tr. 333, 335].

Plaintiff is also purportedly unable to cook due to safety concerns caused by memory problems. [Tr. 239]. He is, however, able to smoke a pipe twice per day without apparent safety concern. [Tr. 276, 359]. Plaintiff consumes between nine to fourteen beers per week. [Tr. 238, 333, 359].

Also in September 2004, plaintiff told the Commissioner that he does not perform housework because, "I choose not to risk my safety." [Tr. 240]. In the preceding twelve months, however, he put 21,000 miles on his Harley Davidson motorcycle. [Tr. 333]. Plaintiff travels unaccompanied on the motorcycle "a great deal." [Tr. 335]. He is also able to frequently visit friends, eat at restaurants, shoot pool, take walks, and fish and golf biweekly in season. [Tr. 239, 240-41, 333].

III.

*Relevant Evidence*

For unknown reasons, plaintiff fell in his home in June 2001, suffering a skull fracture, hemorrhagic contusions, and subdural hematomas. [Tr. 286, 304, 309]. He was hospitalized for three weeks [Tr. 292] and then spent most of August 2001 in a rehabilitation facility. [Tr. 371-677].

In October 2001, plaintiff told treating physician Steven Adkins that he was "doing very well." [Tr. 287]. Dr. Adkins observed, "You can detect a little change in his personality or speech patterns. Has a little word finding problem but he feels like he has no other deficits." [Tr. 287].

October 2001 imaging showed "posttraumatic changes with encephalomalacia and atrophy involving the right temporal lobe and the right frontal lobe [along with] [p]ersistent 'inflammatory' changes of the paranasal sinuses." [Tr. 327].[1] On November 1, 2001, plaintiff had a followup appointment with Dr. Ken Smith of the Blue Ridge Neuroscience Center. Dr. Smith described plaintiff as "alert and oriented x 3. He demonstrates an adequate attention span and ability to concentrate. He has good recent and remote memory. His language shows accurate naming of objects. He demonstrates a full vocabulary and fund of knowledge." [Tr. 324]. Dr. Smith found no need for further surgery and opined that plaintiff "has returned to his normal mentation[.]" [Tr. 325-26].

---

[1] Encephalomalacia is softening of the brain. *Dorland's Illustrated Medical Dictionary* 589 (29th ed. 2000).

At his next appointment with Dr. Adkins in January 2002, it was noted that "speech and word finding ability are still somewhat affected but he seems alert and appropriate in his responses." [Tr. 285]. Plaintiff was "restricted from driving because of the possibility of seizures." [Tr. 284]. By April 2002, plaintiff had been released to drive his personal vehicle but not fire trucks. [Tr. 282]. He continued to report "some difficulty with word finding and remembering words at times but sa[id] he gets by pretty well." [Tr. 282].

In June 2002, Dr. Smith released plaintiff to return to work "with informal supervision." [Tr. 319]. In June 2003, Dr. Adkins's office described plaintiff as being "in no acute distress" and "doing well." [Tr. 273, 276].

In March 2004, Dr. Adkins again noted that plaintiff was experiencing "a slight speech problem with word finding difficulty but seems otherwise neurologically intact." [Tr. 265]. On June 8, 2004, Dr. Adkins "discussed that his thinking problems would effectively disable him and most likely prevent him from regular employment." [Tr. 263]. In December 2004, plaintiff reported worsening memory and headaches. [Tr. 255]. Dr. Adkins continued to note "some difficulty in word finding[.]" [Tr. 255]. Plaintiff "continue[d] to drink alcohol occasionally but state[d] that he does not get drunk or drink to excess." [Tr. 255].

Senior psychological examiner Elizabeth Jones generated a mental status examination in September 2004. When the interviewer "asked if he had attempted to find employment since retirement [from the fire department], he stated, 'Would you hire me?

Who's going to hire me with my medical history[?]'" [Tr. 332]. According to Ms. Jones's assessment, "He had no difficulty with attention or concentration and responded to inquiry without repetition. There was no evidence of psychomotor agitation nor retardation. . . . His stream of conversation was appropriate and he was both rational and alert." [Tr. 334]. "When asked about specific memory deficits, he stated, 'Just every once in a while, I might leave the water running. . . . I don't think it's much worse than any age-related memory problem.'" [Tr. 334]. Ms. Jones concluded,

> Mr. Gilliam does not appear to be significantly limited in his ability to understand and remember and should be able to understand and remember work-like procedures. He does not appear to be limited in his ability to sustain concentration and persistence, and should be able to make work-related decisions. He is not limited in his ability to interact in a socially appropriate manner and maintain basic standards of neatness and cleanliness. He is not limited in [the] area of adaptation as he travels unaccompanied quite frequently, and appears to be aware of normal hazards and takes appropriate precautions.

[Tr. 335-37].

Dr. George Bounds completed a Physical RFC Assessment on October 1, 2004. Dr. Bounds predicted that plaintiff could work at all levels of exertion [Tr. 352] but should never climb ladders, ropes, or scaffolds "due to seizure precaution." [Tr. 353].

Plaintiff returned to Dr. Adkins in March 2005. Plaintiff continued to report problems with memory and speech. He also reported some tremors, most noticeable while shooting pool. [Tr. 362]. There was "[n]o evidence of any seizure activity." [Tr. 362]. In June 2005, "mild" tremors were again reported. [Tr. 359]. There were also mild hemorrhoid

complaints noted by Dr. Adkins to be "primarily probably due to the summer heat riding his motorcycle." [Tr. 359].

In September 2005, Dr. Adkins wrote to plaintiff's attorney. Dr. Adkins stated in material part,

> My primary diagnosis continues to be residuals from closed head injury, severe.
>
> . . . I have observed marked changes in this patient which clearly date back to his head injury. He exhibits very poor short term memory, states that he frequently makes mistakes and cannot complete tasks in a timely fashion, and by history cannot meet his ADL's without the help of his roommate. I have observed significant speech and word finding difficulty and impaired word processing. I have no doubt that he has markedly poor stress tolerance and would be unable to interact with co-workers, supervisors, or the general public. His presentation is classic given his closed head injury. I have no doubt that he is incapable of handling the mental rigors of any gainful activity on a regular and sustained basis and any activity that he attempted would require essentially one-on-one supervision.
>
> . . . In my opinion Mr. Gilliam is not having any complications due to his alcohol intake, nor does his alcohol intake cause limitations in his ability to work. His inability to work is the result of the residuals of his closed head injury.

[Tr. 357-58].

Dr. Adkins's opinion is echoed by Craig Dye, plaintiff's former supervisor and now the Chief of the Kingsport Fire Department. According to Mr. Dye, plaintiff exhibited confusion and forgetfulness upon returning to work after his fall, resulting in the need for "essentially . . . one-on-one supervision during the time he attempted to work." [Tr. 253]. Mr. Dye's observations pertain to the period between late 2001 and June 30, 2003, which is

7

the alleged disability onset date. [Tr. 682]. Mr. Dye admittedly has no knowledge of plaintiff's current daily activities. [Tr. 218].

IV.

*Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). Nonetheless, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490 (1951).

A claimant is entitled to disability insurance payments under the Social Security Act if he (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. §§ 423(a)(1), 416(l). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A). Disability is evaluated pursuant to a five-step analysis summarized by the Sixth Circuit as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his RFC and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Claimants bear the burden of proof at the first four steps. *See Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *See id.*

V.

*Analysis*

Where a claimant is found to be *physically* capable of performing substantially all of the work existing at a particular exertion level, the Commissioner may meet his step five burden by referencing the medical-vocational guidelines ("the grid") unless the claimant has *nonexertional* impairments of sufficient significance. *See Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771-72 (6th Cir. 1987); SSR 83-11, 1983 WL 31252 (Nov. 30, 1982). "Nonexertional" impairments are mental, sensory, or environmental. *See Cole*, 820 F.2d at 772. In the present case, the ALJ concluded that plaintiff's alleged mental limitations are of no more than mild severity. He accordingly relied on the grid to direct a finding of "not disabled."

In closely related arguments, plaintiff contends that the ALJ erred by: (1) rejecting the opinion of treating physician Adkins; and (2) applying the grid. If fully credited, Dr. Adkins's opinion would preclude all employment. Even if not fully credited, the opinion could support the existence of nonexertional impairments, such as restricted short-term memory, persistence, social interaction, and stress tolerance, which would preclude use of the grid.[2]

The opinion of a treating physician is entitled to great weight if supported by sufficient clinical findings consistent with the evidence. *See Cutlip v. Sec'y of Health &*

---

[2] Plaintiff *does not* specifically challenge application of the grid in light of his purported seizure impairment. [Doc. 11, ex. 1, p. 7-10]. That issue is accordingly waived.

10

*Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). The Commissioner may reject the opinion of a treating physician if it is not supported by sufficient medical data and if a valid basis is articulated for the rejection. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). In the present case, the court concludes that the ALJ articulated valid bases for the rejection of Dr. Adkins's opinion.

In his letter to plaintiff's counsel, Dr. Adkins cited

> *marked changes . . . very poor* short term memory . . . *frequent*[] . . . mistakes . . . *cannot* complete tasks in a timely fashion, and by history *cannot* meet his ADL's without the help of his roommate. I have observed *significant* speech and word finding difficulty and impaired word processing. I have no doubt that he has *markedly poor* stress tolerance and would be unable to interact with co-workers, supervisors, or the general public.

[Tr. 357] (emphases added). However, as noted by the ALJ [Tr. 21], Dr. Adkins's extreme assessment far exceeds his recorded observations. Specifically, Dr. Adkins noted "a *little* change in his personality or speech patterns" [Tr. 287], "a *little* word finding problem" [Tr. 287], "speech and word finding ability . . . *somewhat* affected but he seems alert and appropriate in his responses" [Tr. 285], "*some* difficulty with word finding and remembering words at times but . . . he gets by pretty well" [Tr. 282], "a *slight* speech problem with word finding difficulty but seems otherwise neurologically intact" [Tr. 265], and "*some* difficulty in word finding." [Tr. 255] (emphases added). Dr. Adkins's observations are wholly inconsistent with his subsequent assessment of marked and very poor inabilities.

As also noted by the ALJ [Tr. 18-21], Dr. Adkins's opinion is inconsistent both with the observations of psychological examiner Jones, who found no significant mental

11

limitations, and with plaintiff's admittedly high activity level. Although Dr. Adkins described "very poor short-term memory," plaintiff told Ms. Jones, "Just every once in a while, I might leave the water running. . . . I don't think it's much worse than any age-related memory problem." [Tr. 334]. Although Dr. Adkins opined that "by history he cannot meet his ADL's without the help of his roommate," plaintiff told Ms. Jones that he performs all his own household chores other than lawnmowing. [Tr. 335]. Although Dr. Adkins purported to have "observed significant speech and word finding difficulty and impaired word processing," Ms. Jones found plaintiff to be "rational and alert" with "no difficulty with attention or concentration," proper responses to inquiry, appropriate stream of conversation, and "no evidence of psychomotor agitation nor retardation." [Tr. 334]. Although Dr. Adkins had "no doubt that he . . . would be unable to interact with co-workers, supervisors, or the general public," plaintiff told Ms. Jones that he has "a bunch of friends" and he told the Commissioner that he gets along with others "very well." [Tr. 241, 333]. Lastly, Dr. Adkins's certainty that plaintiff "is incapable of handling the mental rigors of any gainful activity on a regular and sustained basis and any activity that he attempted would require essentially one-on-one supervision" is grossly inconsistent with plaintiff's admittedly extensive independent motorcycle riding - a particularly striking inconsistency since Dr. Adkins was aware of the motorcycle riding. [Tr. 359].

   The court also agrees with the ALJ's observation that alcohol consumption "further diminishes the claimant's overall credibility." [Tr. 21]. By self-report, plaintiff

12

consumes between nine to fourteen beers per week. [Tr. 238, 333, 359]. To be certain, there is no definitive evidence of alcoholism as contemplated by 42 U.S.C. § 423(d)(2)(C). Nonetheless, a reasonable factfinder could certainly conclude that consumption of nine to fourteen beers per week is inconsistent with the style of life that one would expect of a person who suffers from the limitations (short-term memory, persistence, and independent living) alleged. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

The court recognizes that Dr. Adkins's assessment is largely supported by the observations of Mr. Dye. The divergent evidence in this case is indeed difficult to reconcile. It is, however, worth noting that Mr. Dye's observations all pertain to the period *prior to* the alleged disability onset date. For example, Mr. Dye recalls one occasion in which plaintiff exhibited confusion while fastening his fireman's coat. [Tr. 253]. At the administrative hearing, plaintiff testified that he had to (and successfully did) relearn how to tie his shoes and fasten buttons. [Tr. 681]. It would therefore appear that Mr. Dye's observations are of questionable relevance to the time period at issue in this appeal. Further, Mr. Dye admittedly has no knowledge of plaintiff's current daily activities [Tr. 218] which, as noted above, are plentiful. As aptly observed by the ALJ, "The record is chock-full of evidence, including the claimant's own reports, that he performs a wide range of daily activities and leads a good life." [Tr. 21].

As is his role, the ALJ weighed the conflicting evidence in this case and adequately explained his decision. The substantial evidence standard of review permits that "zone of choice." *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). The court accordingly finds no error in the ALJ's rejection of Dr. Adkins's assessment.

For the same reasons, the court finds no merit in plaintiff's argument that his mental limitations preclude use of the grid. For the grid to not be applicable, there must exist a nonexertional impairment that *significantly* or *severely* restricts the ability to work. *See Cole*, 820 F.2d at 772. A minor or merely possible restriction is insufficient. *See Kimbrough v. Sec'y of Health & Human Servs.*, 801 F.2d 794, 796 (6th Cir. 1986). As discussed above, in light of Ms. Jones's evaluation and plaintiff's admitted activity level, the ALJ did not err in concluding that plaintiff does not suffer from a *significantly* or *severely* limiting mental impairment.

This court cannot reverse a decision of the Commissioner merely because a reasonable mind could have reached a different conclusion. *See, e.g., Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Under substantial evidence review, the ALJ decision at issue must be affirmed. An order consistent with this opinion will be entered.

ENTER:

        s/ Leon Jordan
United States District Judge